**Carrie MEEK, et al., Plaintiffs,**

v.

**METROPOLITAN DADE COUNTY, FLORIDA, et al., Defendants.**

No. 86–1820–CIV.

United States District Court,
S.D. Florida.

Sept. 11, 1992.

Thomasina H. Williams, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, Fla., for plaintiffs Packington, Meek Burke and intervenor Ferguson.

Steven M. Cody, Miami, Fla., for plaintiffs.

Robert A. Duvall, Dade County Attorney's Office, Miami, Fla., for defendants.

## AMENDED FINAL JUDGMENT

GRAHAM, District Judge.

This Cause is before the Court on a vote dilution claim brought by Black and Hispanic Plaintiffs pursuant to Section 2 of the Voting Rights Act of 1965, as amended in

1982. Having considered the testimonial and documentary evidence presented at trial as well as the stipulations of the parties, the Court concludes, on the basis of factual findings, that Dade County's present at-large system of election to the County Commission violates Section 2 of the Voting Rights Act by diluting both Black and Hispanic voting power. Accordingly, Plaintiffs are entitled to appropriate relief, including an order enjoining Defendants from conducting elections under the present at-large system.

## I. THE PARTIES

Black Plaintiffs are Carrie Meek ("Meek"), James Burke ("Burke"), and Ralph Packingham ("Packingham"). They are Black adult citizens registered to vote in Dade County. Meek and Burke are members of the Florida Legislature. Plaintiff/Intervenor Betty Ferguson ("Ferguson") is also a Black Dade County registered voter. Ferguson was an unsuccessful candidate for the County Commission in 1986 and 1990.[1] Meek, Burke, Packingham and Ferguson will be referred to collectively herein as "Black Plaintiffs".

Hispanic Plaintiffs Xavier Suarez, Maurice A. Ferre, Victor DeYurre, Pedro Jose Gonzalez, Prisciliano Falcon and Orlando Urra are Hispanic adult citizens and Dade County registered voters. They will hereinafter be referred to as "Hispanic Plaintiffs".

The Defendants are Metropolitan Dade County, Florida and the following individuals, all of whom are sued in their official capacities only: Mayor Steven P. Clark, Commissioners Mary Collins, Charles Dusseau, Joseph Gersten, Larry Hawkins, Alexander Penelas, Harvey Ruvin, Arthur Teele and Sherman Winn. Dade County is a political subdivision of the State of Flori-da. The Dade County Board of County Commissioners is the legislative and governing body of the County. The Defendants will hereinafter be referred to collectively as "the County" or "Defendants".

## II. PROCEDURAL BACKGROUND [2]

On August 22, 1986, Black and Hispanic Plaintiffs filed this action against Dade County claiming that the structure for electing the Board of County Commissioners violated Section 2 of the Voting Rights Act, as amended in 1982, by diluting Black and Hispanic voting power.

On October 5, 1988, United States District Judge Kenneth L. Ryskamp ruled on cross-motions for summary judgment in favor of Dade County.[3] Judge Ryskamp, however, held that both Black and Hispanic Plaintiffs satisfied the first two prongs enunciated in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) in that: (1) Plaintiffs are sufficiently large and geographically compact minority groups to constitute a majority in a single-member district, and (2) Plaintiffs are politically cohesive.

On appeal to the United States Court of Appeal for the Eleventh Circuit, the Appellate Court reversed and remanded the case back to the District Court. *Meek v. Metropolitan Dade County, Fl.,* 908 F.2d 1540 (11th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1108, 113 L.Ed.2d 217 (1991). The Eleventh Circuit held that Judge Ryskamp erred in the application of the third *Gingles* prong by not applying the appropriate legal significance to the permanent anti-minority majority in Dade County created by the hostility between Blacks and Hispanics. *Id.* at 1545. The Court noted that Judge Ryskamp "fail[ed] to recognize that coalitions can form a legally signifi-

---

**1.** United States District Judge Kenneth L. Ryskamp, to whom this case was originally assigned, granted Ferguson leave to intervene in the action shortly after she lost her second bid for the County Commission.

**2.** For a more detailed description of the procedural history in this case, refer to this Court's Order denying Hispanic Plaintiffs' motion for final summary judgment and granting partial summary judgment dated May 26, 1992, 805 F.Supp. 958.

**3.** The District Court held that Plaintiffs had failed to satisfy the third *Gingles* prong by not establishing "the existence of a Non–[Hispanic] White bloc majority that usually defeats the election of the minority's preferred candidate. *See* District Court Order of October 5, 1988.

cant voting bloc, and that a coalition of Hispanics and Non–[Hispanic] Whites, [and a coalition of Blacks and Non–Hispanic–Whites] could form the relevant majority voting bloc for the purpose of the third *Gingles* factor." *Meek,* 908 F.2d at 1545–46. Upon remand, all parties filed cross-motions for summary judgment before United States District Judge James Lawrence King.[4] Judge King denied Plaintiffs' and Defendants' motions, ruling that there were genuine issues of material fact as to whether Plaintiffs could satisfy the third prong of the test set forth in *Gingles.* Specifically, Judge King ruled that there were genuine issues of material fact involving the ability of Blacks to elect their preferred representatives, whether the Hispanics are indeed an electoral minority that can be blocked from electing their preferred representatives.

Lastly, on August 28, 1991, Hispanic Plaintiffs filed their Renewed Motion for Final Summary Judgment.[5] This Court's independent analysis held that Hispanic Plaintiffs had not met their summary judgment burden in demonstrating that there exist no genuine issues of material fact on the third prong in *Gingles.* Moreover, this Court conducted an independent review of all the relevant pleadings and factual submissions addressing Black and Hispanic Plaintiffs' claims on prongs one and two of *Gingles,* and concluded that it agreed with the previous findings by the District Court and conclusions of the Eleventh Circuit that Black and Hispanic Plaintiffs have satisfied prongs one and two of the *Gingles* test.[6]

4. Pursuant to Judge Ryskamp's Order of Recusal on April 15, 1991, this case was reassigned to Judge King.

5. This case was randomly reassigned from Judge King's calendar to Judge Graham's docket on October 11, 1991.

6. Eleventh Circuit in Meek concluded:
   In sum, as to the first *Gingles* prong, we affirm the district court's conclusion that the [Black and Hispanic] plaintiffs have satisfied their burden. The second prong is not in dispute. As to the third *Gingles* prong, we conclude that the district court's legal analysis was premised upon legal error.

## III. LEGAL STANDARDS

### A. *The Voting Rights Act*

In order to fully comprehend the legal standard required to be applied in this case, the history of the Voting Rights Act is summarily examined.

On August 6, 1965, the Voting Rights Act was signed into law to rectify injustices caused by discriminatory election practices. Immediately thereafter, several constitutional challenges to the 1965 Voting Rights Act ("the Act") were filed. On March 7, 1966, only seven months after the legislation had been enacted, the Supreme Court upheld the constitutionality of the Act in *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). The Supreme Court, held that after nearly a century of resistance to the Fifteenth Amendment[7], the ineffectiveness of prior Congressional remedies, and the continued existence of racial discrimination in voting laws and practices, Congress was required to assemble an "array of potent weapons" to guarantee Blacks access to the political process. *Katzenbach,* 383 U.S. at 336, 86 S.Ct. at 823. *See* S.Rep. No. 295 at 24, 30–31, 1975 U.S.C.C.A.N. at 790, 797.

An extension of the Act was signed into law on August 6, 1975. The most important revision to the Act was the expansion of its protection to "language minorities". The 1975 legislation, by expanding the Act's protection to include not only racial minorities but also language minorities, broadened the Act beyond the boundaries of the Fifteenth Amendment and also its original geographic target of the South.[8]

*Meek,* 908 F.2d at 1549.

7. U.S. Const. amend. XV. Section 1 of the Amendment states that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude."

8. *Campos v. City of Baytown,* 840 F.2d 1240, 1244 (5th Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989) (Section 2 of the Voting Rights Act, 42 U.S.C. "1973(a) protects the rights to vote of both racial and language minorities." *See Gingles v. Thornburg,* 478 U.S. 30, 43, 106 S.Ct. 2752, 2762, 92 L.Ed.2d

Additional areas in the South encompassed by this language-minority extension were Texas and Florida as well as other states around the country. S.Rep. No. 295, 94th Cong., 1st Sess. 8 (1975), reprinted in 1975 U.S.C.C.A.N. 774 (hereinafter "Senate Report"). Specifically, the revision applied in states or local subdivisions where more than five percent of the voting age population belonged to a single language minority of the following specified groups: Alaskan Natives, American–Indians, Asian–Americans, or people of Spanish heritage. Indeed, the 1975 revisions simply codified what the Supreme Court had held two years earlier. In *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Supreme Court found that official discrimination in Texas diluted the right of Black and Mexican–American voters to participate equally in the political process. Further, the Court stated that, although multi-member districts are not *per se* unconstitutional, a claim can be made that multi-member districts "are being used invidiously to cancel out or minimize the voting strengths of racial groups." *Id.* at 765, 93 S.Ct. at 2339.

Similarly, the Supreme Court in *Zimmer v. McKeithen*, 485 F.2d 1297, 1305 (5th Cir.1973), *aff'd, sub nom., East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), again noted that at-large and multi-member district schemes were not *per se* unconstitutional, but if a constitutionally protected minority group could show that they were denied the opportunity to participate in the political processes and to elect candidates of their choice, then the scheme would be unconstitutional. The *Zimmer* Court relied upon a list of factors established in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), for a dilution claim. The Court in *Zimmer* held that vote dilution exists:

> ... where a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interest, a

tenuous state policy underlying the preference for multi-member or at-large districting, or the existence of past discrimination in general [and these factors] preclude the effective participation in the election system ... Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographic subdistricts.

*Zimmer*, 485 F.2d at 1305. The above-listed factors are commonly referred to as the *Zimmer* test, or the "totality of the circumstances" doctrine.

In *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court rejected the legal standards of the *Zimmer* test and stated that evidence of discriminatory intent was required for a successful vote dilution claim. The Court held that although these factors "may afford some evidence of a discriminatory purpose, [they] were most assuredly insufficient to prove an unconstitutionally discriminatory purpose in the present case." *Id.* 446 U.S. at 73, 100 S.Ct. at 1503. The *Bolden* Court essentially overturned the *Zimmer* "totality of circumstances" test. Proof of the discriminatory intent standard was required until 1982 when the amendments to the Act eliminated the "intent" standard and restored the "results" standard established before *Bolden*.

### B. The 1982 Voting Rights Act Amendments

The *Bolden* decision established a burden of proof that was difficult, if not impossible, for plaintiffs to meet. *Bolden's* break with precedent in previous vote dilution cases became the impetus for Congress to amend the Voting Rights Act to make evidence of discriminatory *results* sufficient to establish a statutory violation of The Voting Rights Act. The amendment, signed by President Ronald Reagan on June 29, 1982, established a statutory

25 (1986) (Section 2 concerns "member[s] of a protected class of racial and language minori-   ties.")

route, circumventing the *Bolden* discriminatory intent requirement. Section 2 of the Voting Rights Act, as amended in 1982, provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 1973(b)(f)(2) of this title, as provided by Subsection (b) of this section.

(b) A violation of Subsection (a) of this Section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* [sic] that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Section 2 thereby restores the legal standards established by the pre-*Bolden* cases.

Furthermore, the Senate Report specifically indicates that proportional representation is not and has never been required by the courts, and that at-large elections are not automatically invalidated under the "results" standard. *See* Senate Report at 177. Moreover, in determining whether minorities have established a Section 2 violation, the Senate Report lists factors which may have probative value. The factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting and the elections of the state or political subdivision is racially-polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

The Senate Report lists two additional factors that may have probative value in establishing a violation:

[8] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. And [9] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*See* Senate Report at 206–07. The Senate Report, however, does not require that any particular number of factors be proven, or that a majority of them point one way or another. Senate Report, 1982, p. 29.

### C. *Thornburg v. Gingles*

The Supreme Court first considered the amended Section 2 in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d

25 (1986). In *Gingles,* Black registered voters challenged one single-member and six multi-member districts under Section 2 of the Act before a three-judge district court in North Carolina. The district court found that plaintiffs proved a majority of the *Zimmer* factors.

On June 30, 1986, the Supreme Court upheld the findings of the district court for four of the five contested multi-member districts and established a three-pronged test for analyzing vote-dilution claims. *Gingles,* 478 U.S. at 48, 106 S.Ct. at 2765. The Court indicated that the three necessary preconditions are:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district ... Second, the minority group must be able to show that it is politically cohesive ... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, ...—usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67.

The *Gingles* Court's reference to the three prongs as necessary preconditions, implies that satisfying the three prongs is only the first step in a vote dilution claim. Furthermore, the Court specifically addressed the "totality of the circumstances" test in its opinion:

As both amended Section 2 and its legislative history make clear, in evaluating a statutory claim of vote dilution through districting, the trial court is to consider the "totality of the circumstances" and to determine, based "upon a searching practical evaluation of the 'past and present reality,'" ... whether the political process is equally open to minority voters.

*Id.* 478 U.S. at 79, 106 S.Ct. at 2781. (Citations omitted).

The *Gingles* Court's minimal attention to any of the *Zimmer* factors other than the degree of racially-polarized-voting and the extent of minority electoral success, caused confusion with regard to the role of the totality of the circumstances test.

### D. *The Eleventh Circuit and the "Totality of the Circumstances" Test*

The Eleventh Circuit Court of Appeals is divided on the issue of the sufficiency of the three *Gingles* factors in proving a Section 2 violation and on the role of the "totality of the circumstances" test. In *Solomon v. Liberty County, Fl.,* 865 F.2d 1566 (11th Cir.1988), *vacated,* 899 F.2d 1012 (11th Cir.1990) (*en banc*), *cert. denied,* —— U.S. ——, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991), the ten sitting judges presented two different concurring opinions, with five of the judges joining Judge Tjoflat's opinion and the remaining five judges joining an opinion authored by Judge Kravitch. In *Solomon,* Black citizens brought suit against the at-large system existing in Liberty County, Florida, for the election of County Commissioners and School Board members. The district court held in favor of the County and the plaintiffs appealed. The Eleventh Circuit, in an opinion written by Judge Tjoflat, remanded the case to the district court and outlined a new four-part test for determining vote dilution, which required plaintiffs to prove that the current electoral system is driven by racial bias in the community or its political system. *Id.,* 865 F.2d at 1573. This new four-part test, however, was disposed of by an *en banc* rehearing which vacated the decision.

The *en banc* rehearing produced two concurring opinions. The opinion authored by Judge Kravitch held that if plaintiffs in *Solomon* satisfied the three *Gingles* factors, a vote-dilution claim was established. Judge Kravitch further stated that "although the district court may consider the totality of the circumstances, those circumstances must be examined for the light they shed on the existence of the three core *Gingles* factors. *Solomon v. Liberty County,* 899 F.2d 1012, 1017 (11th Cir. 1990).

Judge Tjoflat wrote that not only are plaintiffs required to prove the three *Gingles* factors, but also that the totality of

the circumstances should be considered. Additionally, Judge Tjoflat declared that evidence of racial bias on the part of voters is also required to succeed on a vote-dilution claim. The opinion stated:

> Section 2 prohibits those voting systems that have the effect of allowing a community motivated by racial bias to exclude a minority group from participation in the political process. Therefore, if a Section 2 defendant can affirmatively show, under the totality of the circumstances, that the community is not motivated by racial bias in its voting, a case of vote dilution has not been made out.

*Id.* at 1022.

Subsequent Eleventh Circuit decisions have not resolved this issue. For example, in the above-styled cause on appeal, Judge Kravitch noted that "this circuit is divided on ... the question of whether proof of the three-core *Gingles* factors was sufficient and whether a defendant could raise as a defense the lack of racial bias in the community." *Meek v. Metropolitan Dade County,* 908 F.2d 1540, 1544 (11th Cir. 1990). Similarly, the Court in *Hall v. Holder,* 955 F.2d 1563, 1568 n. 9 (11th Cir.1992), also noted the Circuit's division "on the issues of whether plaintiffs can succeed in a Section 2 violation simply by establishing the *Gingles* factors and whether defendants can raise a defense under the totality of the circumstances after the plaintiffs have satisfied the *Gingles* preconditions."

■ Giving due consideration to the views expressed in Judge Tjoflat's and Judge Kravitch's specially concurring opinions in *Solomon v. Liberty County,* 899 F.2d 1012 (11th Cir.1990), the legal standard applied by this Court is that a minority group must initially satisfy the three *Gingles* factors to succeed on a Section 2 claim. Upon satisfaction of these criteria, this Court then considers the factors referred to as the "Senate Report" or *Zimmer* factors under a "totality of the circumstances" analysis.

■ Concerning the affirmative defense of requiring Defendants to prove that the voters are not motivated by racial bias, this Court again takes note of the Eleventh Circuit's split and gives due consideration to both panels. The difficult task, however, comes in determining what proof to analyze in order to show the existence or lack of racial bias among voters. Therefore, in determining whether the community of Dade County is racially divided and driven by racial bias, this Court will examine voting patterns along racial lines as established by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. at 53, 106 S.Ct. at 2768, n. 21.

## IV. FINDINGS OF FACT

### A. Background

Dade County, one of Florida's sixty-seven counties, was created by an act of the Florida Legislative Council in 1936. From approximately 1885 until 1957, Dade County was governed by a County Commission comprised of five members elected at-large. Section 11 of Article VIII of the 1885 Constitution granted that "the electors of Dade County, Florida, shall have the power to adopt, revise and amend from time to time a Home Rule Charter of government for Dade County, Florida, under which the Board of County Commissioners * * * shall be the governing body." In 1956, the voters of Florida approved an amendment to Article VIII, Section 11 of the State Constitution, permitting Dade County voters to adopt a Home Rule Charter.

In the late 1950s, Dade County's political population was essentially ethnically homogeneous. At that time, Black and Hispanic political power was insignificant. In 1957, the voters of Dade County adopted a Home Rule Charter, providing for the election of five members of the County Commission from single-member districts, five by the voters at-large, and one representative from each municipality with more than a 60,000 population. In 1957, the City of Miami was the only municipality that qualified to have its own Commissioner. After the 1960 census, Miami, Miami Beach and Hialeah qualified to have municipally-elected representatives on the County Commission. By 1963, the County Commission was comprised of 13 members: five elected

from districts, five at-large, and one from each of the cities of Miami, Hialeah, and Miami Beach. In 1964, the Home Rule Charter was amended, resulting in the elimination of the mixed system of electing County Commissioners. Under the present system, the Mayor and the eight Commissioners are each elected to four year terms by a majority of the voters at-large.[9] The Mayor may reside anywhere in the County and must deliver an annual State of the County Address. Unlike the Mayor, however, County Commissioners are required to run from designated residence districts.

Beginning in 1976, the terms of the Commissioners were staggered; that is, four Commissioners are elected every two years. Vacancies on the Commission are filled by a special election or, until the next county-wide election, by a majority vote of the remaining members of the Board. County Charter, § 1.07.

## B. Dade County Demographics

Dade County's large metropolitan area includes 27 different municipalities and an unincorporated area. Consisting of 2,300 square miles, Dade County is physically larger than four states. With almost two (2) million people, it has a population greater than 15 states.

The racial and ethnic make-up of Dade County's population is one of the most diverse in the country. Over the last three decades, Dade County has experienced a heavy influx of immigrants, primarily Hispanic.

Dade County's racial and ethnic demographics of the voting age population ("VAP") from 1960 through 1990 are depicted in the following table:

| Year | Total VAP | Hispanic VAP | Hispanic VAP % | Non–Hispanic Black VAP | Non–Hispanic Black VAP % | Non–Hispanic White VAP | Non–Hispanic White VAP % |
|------|-----------|--------------|----------------|------------------------|--------------------------|------------------------|--------------------------|
| 1960 | 642,598 | 25,786 | 4.01% | 79,706 | 12.40% | 537,106 | 83.58% |
| 1970 | 897,136 | 202,748 | 22.60% | 105,914 | 11.81% | 588,474 | 65.59% |
| 1980 | 1,233,545 | 439,429 | 35.62% | 169,582 | 13.75% | 624,534 | 50.63% |
| 1990 | 1,469,084 | 741,846 | 50.50% | 239,955 | 16.33% | 487,283 | 33.17% |

Accordingly, in 1980, Blacks comprised 13.75% of the voting age population, and as of September 22, 1980, 16% of the registered voters in Dade County. By 1990, Blacks had increased to 16.33% of the voting age population. As of October 15, 1990, Blacks comprised 20% of the registered voters in Dade County. As of June 2, 1992, the day prior to the commencement of the trial, Blacks continued to constitute 20% of Dade County's registered voters.

Although Hispanics are a majority of the voting age population, the Court finds that Hispanics are not a majority of the registered voters[10] in Dade County.[11]

**9.** The Charter provides that "[i]f no candidate receives a majority of the votes cast there will be a run-off election at the time of the state second primary election between the two candidates receiving the highest number of votes. Should a tie result, the outcome shall be determined by lot." County Charter, § 2.01(B).

**10.** In relying on the evidence of registered voters and not on evidence of total population, this Court was guided by the Eleventh Circuit and Judge King's July 30, 1991 Order, 769 F.Supp. 1220. The Eleventh Circuit based its conclusion on the relevant data pertaining to registered voters. The Appellate Court noted that "[t]he only evidence [considered] related to total population and numbers of registered voters." *Meek,* 908 F.2d at 1546. Moreover, Judge King's Order denying both Plaintiffs' and Defendants'

summary judgment motions, held that it is evidence of citizens who are eligible to vote rather than evidence of the voting age population that is relevant for purposes of determining vote dilution. Judge King explained:

> Where Hispanics have become a bare majority of the voting age population—achieving the majority status by just 0.5%—there remains a material issue of fact as to whether the number of Hispanics who cannot yet register to vote will cause this Hispanic "majority" to be "politically submerged" as a minority of those who are either enfranchised or capable of becoming enfranchised. This is illustrated by the reality that Dade County Hispanics who have moved to the United States within the last five years, even if they are of voting age,

**11.** See note 11 on p. 976.

## V. BLACK PLAINTIFFS [12]

### A. *The Three–Pronged Gingles Test*

#### 1) Settled factual and legal issues

■ The Court has held that Black Plaintiffs have proven that 1) Blacks are sufficiently large and geographically compact to constitute a majority in a single member district, and 2) Blacks are politically cohesive. Therefore, prongs one and two of *Gingles* have been satisfied.[13]

#### 2) Prong three—majority bloc voting

■ In order to prove the third prong in *Gingles*, Black Plaintiffs must be able to demonstrate that the Non–Black [14] majority "votes sufficiently as a bloc to enable it—in the absence of special circumstances, ...— usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67.

The Court's analysis of seven elections over the last three election years, which encompassed a four-year period, is sufficient under the circumstances of this case to determine whether a Non–Black majority voting bloc impairs Blacks in their ability to elect their preferred representatives. *See Gingles*, 478 U.S. 30, 75, 106 S.Ct. 2752, 2779 ("nothing in [Section 2] or its legislative history prohibit[s] the Court ... from deciding on the basis of all the relevant circumstances to accord greater weight to Blacks' relative lack of success over the course of several recent elections.") In the seven elections analyzed, the following percentages of Black and White voters voted for the indicated Black candidate:

### BLACK CANDIDATES TO
### DADE COUNTY COMMISSION (1986–1990)

| CANDIDATE | YEAR | RESIDENCE DISTRICT | % Black VOTE | % Non–Black VOTE |
|---|---|---|---|---|
| Barbara Carey | 1986 | 3 | 76.2 | 60.0 W |
| Betty Ferguson | 1986 | 1 | 87.8 | 31.6 – |
| Betty Ferguson (Runoff) | 1986 | 1 | 100.0 | 34.4 L |
| Barbara Carey | 1990 | 3 | 84.6 | 35.5 L |
| Betty Ferguson | 1990 | 1 | 96.3 | 22.4 – |
| Betty Ferguson (Runoff) | 1990 | 1 | 100.0 | 28.4 L |
| Daniel Azemar | 1990 | 4 | 2.1 | 13.0 L |
| Theodore E. Brown, Jr. | 1990 | 4 | 39.7 | 10.3 L |

In six of the most recent elections analyzed where a Black candidate received the majority of the Black vote, the Black candidate lost the election in every instance but one. In that one instance, the Black candidate was Barbara M. Carey, a two-term incumbent who had initially been appointed to office.

The above results are based on the ecological regression analysis performed by

cannot normally have obtained the right to vote. *See, e.g.*, 8 U.S.C. § 1427(a) (imposing a five year residence period before persons can be naturalized). Given this factual issue as to Hispanic voting strength, this court finds that summary judgment cannot be entered for any party as a matter of law. *See* District Court Order, July 30, 1991 at 1222. Therefore, this Court also relies on evidence of registered voters in conducting its analysis.

11. *See* Hispanic Plaintiffs' Findings of Fact, *infra*.

12. The Court addresses the Plaintiffs' claims separately, with the Black Plaintiffs claims first and the Hispanic Plaintiffs' claims second.

13. *See* District Court Order dated May 26, 1992, 805 F.Supp. 958, granting Plaintiffs' Partial Summary Judgment.

14. Non–Blacks refer to Hispanics and Non–Hispanic Whites.

Dr. Engstrom.[15] The results show that in resident District 3 in 1986, Barbara Carey received 76.2% of the Black vote, and 60% of the Non–Black vote. The Court finds that Barbara Carey was the preferred candidate of Black voters in that election. The chart also shows that in the 1986 first primary involving Betty Ferguson, she received 87.8% of the total Black vote and 31.6% of the Non–Black vote. Again, the Court finds that in residence District 1 in 1986, Betty Ferguson was the preferred representative of the Black vote, and not the preferred candidate of the Non–Black voters in that election.

Next, the Court analyzed the same election in a run-off capacity. Dade County, which requires that a candidate receive a majority of the votes cast in the primary, holds a run-off election between the top two candidates if neither one received a majority. In the run-off election in 1986, the regression analysis produced a result that demonstrates that Betty Ferguson received virtually every Black vote cast. Among White voters, however, Betty Ferguson received 34.4% of the votes cast. The Court finds that in 1986, although Betty Ferguson was the Black preferred candidate in District 1, she was not the preferred candidate of the Non–Black voters.

The next three elections were also analyzed and the Court again finds a severe degree of racially-polarized-voting. Lastly, Dr. Engstrom analyzed the 1990 election in residence District 4 where Black candidates Daniel Azemar and Theodore Edward Brown, Jr. ran against incumbent Sherman Winn, a Non–Hispanic–White. Although the results for this election show that Sherman Winn received larger Black votes for position 4 than either of the two Black candidates, the Court gives less weight to this election because he ranked fourth among the candidates who received the majority of Black votes countywide. *See Collins v. Norfolk, Va.,* 883 F.2d 1232 (4th Cir.1989) *cert. denied,* —— U.S. ——, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990) ("support for some successful candidates by a majority of minority voters in multi-member district races does not prove that the successful candidates were the chosen representatives of the minority when a candidate who received much greater minority support was defeated.") The Court finds that the regression analysis demonstrates that, since 1986, even with overwhelming support by Blacks for Black candidates, the Non–Black majority usually defeats the Blacks' preferred candidate.[16]

15. Dr. Richard Engstrom, a research professor of political science at the University of New Orleans, and a duly-qualified expert witness for Black Plaintiffs, collected and studied data from the past seven contests where Black candidates were seeking seats on the Dade County Commission. Dr. Engstrom based his findings upon the method of regression analysis. The specific variant of regression analysis is the two equation method, weighted by the relative level of voter registration in every precinct.

16. Blacks Plaintiffs' expert, Dr. Engstrom, also conducted a homogeneous precinct analysis, sometimes referred to as stream case analysis.

A homogeneous precinct analysis isolates the precincts that are overwhelmingly Black and only demonstrates how Black voters and White voters voted in precincts that were either 90% Black in voter registration, or 90% Non–Black in voter registration. The disadvantage in a homogeneous precinct analysis is that it reveals voting patterns in precincts with extreme degrees of voter registration, but not of racially mixed precincts as does a regression analysis. Nevertheless, an analysis was conducted in homogeneous precincts which produced the following percentages of Black and White voters who voted for the indicated Black candidate:

BLACK CANDIDATES TO
METROPOLITAN DADE COUNTY, FLORIDA COUNTY COMMISSION (1986–1990)

| CANDIDATE | YEAR | RESIDENCE DISTRICT | % Black VOTE | % Non–Black VOTE |
|---|---|---|---|---|
| Barbara Carey | 1986 | 3 | 76.2 | 60.0 W |
| Betty Ferguson | 1986 | 1 | 87.8 | 31.6 – |
| Betty Ferguson (Runoff) | 1986 | 1 | 100.0 | 34.4 L |
| Barbara Carey | 1990 | 3 | 84.6 | 35.5 L |
| Betty Ferguson | 1990 | 1 | 96.3 | 22.4 – |
| Betty Ferguson (Runoff) | 1990 | 1 | 100.0 | 28.4 L |
| Daniel Azemar | 1990 | 4 | 2.1 | 13.0 L |
| Theodore E. Brown, Jr. | 1990 | 4 | 39.7 | 10.3 L |

### 3) Defendants' Argument

The statistical evidence relied on by Defendants demonstrates that in the thirteen contests since 1968, Black candidates have won seven times. The Court finds, however, that the data does not show that Blacks in Dade County are able to elect preferred candidates in the absence of special circumstances.

At trial, Defendants produced data showing that in elections to the Dade County Commission involving Black candidates from 1968 to 1990, the Black candidate has won seven of the thirteen elections. A closer scrutiny of the circumstances in those races, however, reveals that incumbency resulting from appointment played a major part in the candidates' success. For example, of the four Black Commissioners who have been elected to the County Commission with a majority of the Black vote, three were first appointed, and then ran as incumbents. The only Black Commissioner who won with a majority of the Black vote

Although the percentages of Black and Non-Black votes differ slightly from the regression analysis percentages, the results in both analyses demonstrate that there was racially-polarized-voting in six of the seven elections analyzed by Dr. Engstrom.

and without the assistance of incumbency, was Earl Carroll, the first Black to serve on the County Commission.[17] Although Arthur Teele was elected to the County Commission in 1990 without the assistance of incumbency, he was not the Blacks' preferred candidate.

Accordingly, the occurrence of Black candidates elected to office as incumbents after having first being appointed, constitutes a special circumstance that explains the election of Blacks to the Dade County Commission. Therefore, the Court finds that the Non–Black majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the Blacks' preferred candidate.

### B. *Totality of the Circumstances*

The Court finds the following circumstances to have contributed to dilution of minority voting strength in Dade County by use of the at-large system for election

17. The three Black Commissioners who ran as incumbents were 1) Neil F. Adams, 2) Edward T. Graham, and 3) Barbara M. Carey. Below is a list of Black candidates who have served on the County Commission:

### HISTORY OF BLACK COMMISSIONERS

| Date | Commissioner | Dist. | Comment |
|---|---|---|---|
| 1968 (05/28) | Carroll, Earl J. | 3 | Elected |
| 1969 (05/00) | Carroll, Earl J. | 3 | Suspended |
| 1969 (05/01) | Adams, Neal F. | 3 | Appointed |
| 1969 (07/25) | Carroll, Earl J. | 3 | Reinstated |
| 1970 (06/00) | Carroll, Earl J. | 3 | Suspended |
| 1970 (07/29) | Carroll, Earl J. | 3 | Reinstated |
| 1972 (03/14) | Carroll, Earl J. | 3 | Recalled |
| 1972 (04/13) | Graham, Edward T. | 3 | Appointed |
| 1972 (09/12) | Graham, Edward T. | 3 | Elected |
| 1975 (05/09) | Graham, Edward T. | 3 | Suspended |
| 1975 (05/28) | Adams, Neal F. | 3 | Appointed |
| 1976 (09/28) | Adams, Neal F. | 3 | Elected |
| 1978 (10/05) | Adams, Neal F. | 3 | Elected |
| 1979 (10/18) | Adams, Neal | 3 | Suspended |
| 1979 (10/19) | Carey, Barbara M. | 3 | Appointed |
| 1982 (09/07) | Carey, Barbara M. | 3 | Elected |
| 1986 (09/02) | Carey, Barbara M. | 3 | Re–Elected |
| 1990 (09/04) | Teele, Jr., Arthur | 3 | Elected |

of Commissioners and incorporates them as Findings of Fact in this case.

### 1) History of Official Discrimination Against Blacks

A history of discrimination is an important factor for this Court to consider since it can severely damage the ability of minorities to presently participate equally in the political process.

The State of Florida has a long history of discrimination against Black individuals. *Bradford County NAACP v. City of Starke,* 712 F.Supp. 1523, 1537 (M.D.Fla. 1989). The clearest example of officially-sponsored discrimination can be found in Florida's poll tax during the beginning of this century. In the early 1900's, Whites adopted a variety of legislative plans, such as poll taxes and all-White primaries, that either completely denied Blacks the right to vote or effectively rendered their vote meaningless.[18] Blacks were also deterred from exercising their right to vote by intimidation and physical violence. *See Id.* 712 F.Supp. at 1537. In addition, Florida enacted "Jim Crow" laws which legalized segregation of public schools, restrooms, beaches, transportation and other facilities.[19]

In the late 1940's, Dade County officials began to subject Blacks to racial zoning which resulted in Blacks being forced out of the City of Miami and Central Dade County into northwest Unincorporated Dade County. As a result of this controlled expansion of Black residential areas, between 1940 and 1960, Dade County suffered from the highest degree of racial segregation in housing of over 100 large cities throughout the country. Blacks were also crowded in other parts of the community in the early part of this century.

By 1970, these laws and policies were no longer in effect and Black residential segregation had improved somewhat, however, compared to other Southern cities, 92% of Blacks in Miami still lived in segregated neighborhoods. Furthermore, in 1980, Dade County still ranked near the top of a list of the sixty most racially-segregated metropolitan areas in the country.[20]

### (a) *Lingering Effects of Past Discrimination*

A history of discrimination may manifest itself in present-day disadvantages in areas such as housing, socio-economic status, education, and employment, which in turn can result in decreased participation and influence in the democratic process. Although some gains have been made, there is no dispute that Blacks in Dade County continue to suffer from lower income levels, lower job classifications, lower education levels, higher poverty rates and higher unemployment rates than do Non–Blacks.

As stipulated by Black Plaintiffs and the County, as late as 1989, of 25 major metropolitan areas, Dade County was among the three worst in terms of housing discrimination against Blacks.[21] Past discrimination has also displayed itself in socio-economic disadvantages.[22] For example, the 1980 Census [23] showed that Black families were poorer than others when measured in terms of average family income in 1979. The median income of Black families in 1979 was only 63% of the median income of White families. With annual incomes of less than $10,000, 40% of all Black families were living in poverty, three times more than the percentage of White families living in poverty. Almost half of that number had annual incomes of less than

---

**18.** *See e.g.,* Fla.Const., Art. VI, § 8 (1885) (Poll Tax).

**19.** *See e.g.,* Fla.Const., Art. XII, § 12 (1885) (Schools); §§ 350.20, 352.03–352.18, Fla.Stat. (1967) (Transportation); *See also* Testimony of Betty Ferguson, Vol. 1 at 88; Testimony of Harold T. Smith, Vol. 1 at 141–44, 196.

**20.** Raymond A. Mohl, *The Settlement of Blacks in South Florida,* Ch. 10 at 124; *see also Profile*

*of the Black Population,* Research Division Metro–Dade County Planning Department at 23.

**21.** *See Revised Pretrial Stipulation* at 10.

**22.** *Id.*

**23.** Socio-economic data compiled from the 1990 Census had not been released at the time of trial.

$5,000.[24]

Although Blacks have made significant strides toward closing the gap between Black and White educational attainment, these encouraging statistics do not conceal the fact that large numbers of Blacks continue to fail to complete high school. In 1980, for example, 21% of Dade County's Black adults, almost twice the percentage of Whites, had failed to complete high school.[25]

Blacks have historically suffered disadvantages relative to White citizens in employment, due partly to inadequate education. Blacks in Dade County are unemployed at rates almost twice those of Whites.[26] Not only is the current unemployment rate for Blacks higher than that of Non–Blacks, but also the number of unemployed Blacks increased between 1970 and 1980.[27]

In 1991, Dade County conducted a Disparity Study to determine whether differences between Black-owned and White-owned businesses in Dade County are due to discrimination. The Study concluded that:

(1) The income disparities suggest that Blacks in Dade County continue to get a smaller fraction of the jobs than their labor force participation rates would lead one to expect. They also fail to move up the occupational scale at a pace comparable to that experienced by other workers. The net result is a continuing—and sizable—short-fall in the share of money income which Blacks receive.
Disparity Study at 14–15.[28]

While the Court recognizes that discrimination has existed in the past, the Court also notes that such overt racism and discriminatory practices are not manifested presently as they did during the periods discussed above. For example, poll taxes and "Jim Crow" laws have long since been abolished. Moreover, this Court notes that the average of Black registered voter turnout from 1986 to 1990 was nearly the same as the Non–Black registered voter turnout.[29] Therefore, in determining vote dilution, the Court gives considerably less weight to this factor under the totality of the circumstances in comparison to the remaining factors.

2) Racially–Polarized–Voting

The Court finds that the statistical evidence demonstrates that when there is a Black candidate running for office, Black and Non–Black voters differ in their voting, with the Black voters overwhelmingly supporting the Black candidate, while the Non–Black voters support the Non–Black candidate and vote against the Black candidate.

The last three elections for Dade County Commission provides a sufficient time frame to analyze Dade County's at-large system and its dilutive consequences in 1992. The framework for analysis in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), was the last three elections held in each of the

---

**24.** *See Report of the Research Division, Metro–Dade County Planning Department.* ("Planning Department Report"). Although Blacks were only 16.58% of the total population in 1980, Black children accounted for half of all children in poverty. *Id.* at 110.

**25.** *Id.* at 2, 49.

**26.** Dade County's *Racial Discrimination and Disparities in the Marketplace, Part I* at 9–10.

**27.** *See Planning Department Report* at 55.

**28.** The findings of the Disparity Study have been adopted by Dade County by Resolution. No. R–80–92.

**29.**

| YEAR AVERAGES | BLACK NON–HISPANIC TURNOUT AS A PERCENTAGE OF BLACK NON–HISPANIC REGISTERED VOTERS | NON–BLACK TURNOUT AS A PERCENTAGE OF NON–BLACK REGISTERED VOTERS |
|---|---|---|
| 1974–1978 | 20.9 | 30.8 |
| 1980–1984 | 22.5 | 27.7 |
| 1986–1990 | 24.5 | 26.1 |

Defendant's Exhibit 2.

multi-member districts in North Carolina. In addition, Dade County's rapidly changing demographics includes a large Hispanic population. In considering both the importance of the greater Hispanic presence in Dade County and which elections to analyze, the Court notes the Eleventh Circuit's finding of a "keen hostility" existing between Blacks and Hispanics in Dade County. *See Meek v. Metropolitan Dade County*, 908 F.2d 1540, 1545 (11th Cir.1990).[30] This Court agrees that the evidence at trial fully supports the Eleventh Circuit's position in *Meek*, and independently finds that there is a "keen hostility" between Blacks and Hispanics in Dade County. Black electoral success prior to 1986 does not reveal present day antagonistic voting patterns, and therefore, is not accurately reflective of current Dade County politics. Hence, any Black electoral success prior to the 1986 elections provides the Court with little legal significance. The Court, therefore, relies more heavily on the statistical analysis of Commission elections since 1986.

Recent elections include seven contests in which Blacks were on the ballot for County Commission seats. In the seven elections analyzed, the Court finds a severe degree of racially-polarized-voting in six of the seven elections.

### 3) Unusually Large Election Districts/Majority Vote Requirements

Dade County's at-large system encompasses an unusually large area. It consists of a large metropolitan area that includes 27 different municipalities and an unincorporated area with almost two (2) million people. Furthermore, Dade County has a population greater than 15 states, and its 2,300 square miles, makes it physically larger than four states.

County Commission elections are non-partisan. To be elected, candidates to the County Commission must receive a majority of the votes cast. If no candidate receives a majority of the votes cast, the two candidates with the highest number of votes engage in a runoff election to determine the winner.

### 4) Discrimination in Education, Employment and Health

As previously discussed, the parties have stipulated that Blacks in Dade County bear the effects of discrimination in such areas as education, employment and health.[31] The Court finds that the depressed levels in education, employment and health are a consequence of historical discrimination. The Court notes, however, that despite the depressed levels in these areas, Blacks are making great strides in overcoming these obstacles as evidenced by their high registered voter turnout levels. Therefore, the Court gives less weight to this factor under the totality of the circumstances.

### 5) Political Campaigns and Racial Appeals

Dade County's at-large elections for Commission seats have been regularly characterized by overt and subtle appeals to racial prejudice. Although in recent years, overt expressions of racist attitudes have become unacceptable, racial appeals persist through a more subtle approach.

Several candidates have resorted to racial fears and prejudices in some of the most hotly contested elections in order to attract enough of a voting bloc to defeat the Blacks' preferred candidate. Recent

---

**30.** The Eleventh Circuit's opinion in *Meek*, relied on the District Court's finding of a keen hostility between Blacks and Hispanics in Dade County. The Eleventh Circuit noted that:

A keen hostility in fact exists between ... [Blacks and Hispanics. The experts'] affidavit shows that without exception, when a Black or Hispanic candidate is running against a non-[Hispanic] White candidate, the other minority group will vote for the non-[Hispanic] White.... In these elections [where Black candidates lost by a small margin], had there been no hostility between Blacks and Hispanics, the election of the Black over the non-

[Hispanic] White would have been all but guaranteed.

*Meek*, 908 F.2d at 1545, citing Judge Ryskamp's Order of October 5, 1988 at 24. The Eleventh Circuit also relied on Judge Ryskamp's Second Order which stated that "one of the many conceivable reasons why Blacks in Dade County have difficulty in electing their preferred candidates [is that] Hispanics do not vote for them." *Id.*, citing Judge Ryskamp's Order of November 6, 1988 at 8.

**31.** *See Revised Pre–Trial Stipulation* at 10.

elections demonstrate how successfully candidates and their supporters have engaged in a tactic of "guilt by association" to defeat Black opponents. This tactic is utilized at the end of the campaign period, immediately prior to election day. For example, voters have been told that Black candidates share common goals with Jesse Jackson or Nelson Mandela, two political figures strongly supported in the Black community, but opposed in some Cuban and Jewish communities.[32]

Racial appeals in either overt or subtle forms abound in the record. Their effect is to reduce the opportunity of Black citizens to participate effectively in the political process and to elect their preferred candidates.

### 6) Black Candidates Elected to the County Commission

In 1968, Earl J. Carroll became the first Black candidate elected to the Dade County Commission with a majority support of Non–Black voters. Since Carroll, however, no Black candidate preferred by Black voters has ever been elected to the County Commission without first being appointed to the Commission. Therefore, although Blacks have been elected to the County Commission, this seeming electoral success does not demonstrate that Blacks are able to elect their preferred representatives in the absence of special circumstances. Additionally, although proportional representation is not required in determining a Section 2 claim, the Court notes that every time a Black candidate has sought a second seat on the Dade County Commission, he or she has been defeated. In most of these contests, the defeat has been caused by racially-polarized-voting.

In recent years, Black voters have become increasingly involved in the political process in Dade County. Ironically, with greater interest and involvement has come less, rather than more, electoral success. For example, in 1986 and again in 1990,

candidate Betty Ferguson sought a seat in the Dade County Commission. She was a candidate with overwhelming support among Black voters. All of the experts who testified estimated that she received virtually 100% of the Black votes cast in her election. Nonetheless, she was defeated by two different candidates. Therefore, the Court finds that the success that has been obtained by Black candidates up to the present is not an indication of Blacks' ability to elect their preferred candidate in the absence of special circumstances.

### Summary of Findings of Fact

The Court finds that under the totality of the circumstances, the present at-large system in Dade County deprives Black voters in Dade County the opportunity to participate effectively in the political process and to elect their preferred representatives.

### C. *Black Plaintiffs' Conclusions of Law*

This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1973j(f) and 28 U.S.C. §§ 1331 and 1343.

The legal principles which the Court must utilize for analyzing claims of vote dilution by an at-large system under Section 2 of the Voting Rights Act are set forth in the legislative history of the 1982 amendments to the Voting Rights Act and by the United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In order for a plaintiff to prevail on a vote dilution claim, three factors must be established: 1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; 2) the minority group is politically cohesive; and 3) the majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. *Id.,* 478 U.S. at 51, 106 S.Ct. at 2766–67. Upon satisfaction of these criteria, the Court applies the "totality of the circumstances" test set forth

---

32. For example, in a 1990 race, a candidate ran radio advertisements on Cuban radio claiming that a Black opponent was strongly supportive of Jesse Jackson, that they "shared a common ideology" and that Jesse Jackson wanted to run Dade County government. On the witness stand, the candidate admitted that the claims were made, admitted that the claims would make it difficult for the Black opponent to gain Hispanic or Jewish support, and that it was not even known if the claims were true.

in Section 2 of the Voting Rights Act, primarily relying on the *Zimmer* factors outlined in the Senate Report.

The Eleventh Circuit, in *Meek v. Metropolitan Dade County*, 908 F.2d 1540 (11th Cir.1990), has given specific instructions regarding the evaluation of evidence for this Court to consider on remand. The Appellate Court specifically instructed as follows:

> The district court must decide whether Blacks or Hispanics have thus far usually elected preferred representatives. The court should also consider whether Blacks or Hispanics are impaired in their ability to elect representatives of their choice by the manner in which the voting districts are now drawn.

*Id.* at 1549.

### 1) Prongs One and Two of Gingles

Concerning the first two prongs in *Gingles*, the Eleventh Circuit in *Meek v. Metropolitan Dade County*, 908 F.2d at 1549, affirmed Judge Ryskamp's earlier findings that both Black and Hispanic Plaintiffs have satisfied their burdens. Moreover, on May 22, 1992, this Court entered a partial summary judgment finding that both Black and Hispanic Plaintiffs had satisfied their burden with regard to the first two prongs of the *Gingles* test, i.e., that each Plaintiff group is sufficiently large and geographically compact to constitute a majority in a single-member district and that each Plaintiff group is politically cohesive.

### 2) Prong Three of Gingles: ability to elect preferred representatives

#### (a) *Elections Considered*

■ Concerning the issue of how many elections should this Court consider in its analysis for a Section 2 claim, it is instructive to note that the Supreme Court in *Gingles* found it sufficient that the plaintiffs produced evidence only as to elections from the last three (3) election years, which encompassed a four-year period. *See Gingles,* 478 U.S. 30, 51, 106 S.Ct. 2752, 2767.[33]

Moreover, in *United States v. Marengo County Commission,* 731 F.2d 1546 (11th Cir.1984), the Eleventh Circuit cautioned that a district court must evaluate conditions as they currently exist, not the conditions that were prevailing at the time that the action was filed.

In Dade County, the Hispanic population during the 1960s and 1970s was marginal. In 1990, however, the census data demonstrated, and this Court finds that Hispanics comprised a minority of the registered voters and a majority of the total population. Given the severe degree of racially-polarized-voting and the "keen hostility" [34] that exists between Blacks and Hispanics today, the Court concludes that only the most recent elections are probative of racial bloc voting in Dade County today.

Accordingly, the Court concludes that the Black plaintiffs' analysis of seven elections over the last three election years,

---

**33.** Although the Court in *Gingles,* considered three additional elections in House District 23, Justice O'Connor noted in a concurring opinion that even such sustained success in the last six elections may not accurately reflect the minority group's ability to elect its preferred representatives if the minority group offers an explanation for such success of the Black candidates such as incumbency or running unopposed. The plaintiffs in *Gingles,* however, failed to offer any explanation for the success of the Black candidates in the previous elections, therefore, the Court held that Blacks had elected their preferred representatives in District 23. *Id.* at 76, 106 S.Ct. at 2780.

Moreover, in *Solomon v. Liberty County, Fl.,* 865 F.2d 1566 (11th Cir.1988), *vacated,* 899 F.2d 1012 (11th Cir.1990) (*en banc*), the Eleventh Circuit approved the plaintiffs' analysis of six (6) elections conducted over the last three (3)

election years, which encompassed a six-year period. *See Id.* at 1577 n. 20 (although the plaintiffs also analyzed two sets of elections that were not for countywide office, the Eleventh Circuit held that the six countywide elections involved minority candidates would have been sufficient when combined with other factors listed under the totality of the circumstances). *See also Solomon,* 899 F.2d at 1021 ("six futile elections is enough ... as a matter of law to establish that white bloc voting ... is racially-polarized to the extent that Blacks are unable to elect the candidates of their choice").

**34.** *See Meek v. Metropolitan Dade County,* 908 F.2d at 1540, 1545 (1990), *quoting* Judge Ryskamp's Order of October 5, 1988 at 24. Additionally, the Court independently finds that there is hostility between Blacks and Hispanics in Dade County.

which encompassed a four-year period, is sufficient on the circumstances of this case to determine that racially-polarized-voting impairs Blacks in their ability to elect their preferred representatives. *See Gingles,* 478 U.S. at 75, 106 S.Ct. at 2779 ("nothing in [Section 2] or its legislative history prohibit[s] the Court ... from deciding on the basis of all the relevant circumstances to accord greater weight to. Blacks relative lack of success over the course of several recent elections.")

### (b) *Commission Elections Without Black Candidates*

■ Although there is no binding authority addressing the issue of whether courts should consider data of elections with only Non–Black candidates, review of pertinent case law persuades the Court that such elections should be given no weight in its consideration of a Section 2 violation.

The Supreme Court's opinion in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), provides little guidance in determining what elections should be considered, and in fact, produced three different opinions on this divisive issue.

Justice Brennan, advocating a race-neutral approach to determining the minority-preferred candidate and writing on behalf of three other justices, stated that "it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate that is important". *Gingles,* 478 U.S. at 68, 106 S.Ct. at 2775. Justice White, in a separate concurring opinion, and Justice O'Connor, writing on behalf of three of the other justices, rejected Justice Brennan's approach and asserted that the race of the candidate should be considered relevant.

Additionally, the Fifth Circuit has consistently rejected Justice Brennan's approach. For example, in *Citizens for a Better Gretna v. City of Gretna,* 636 F.Supp. 1113 (E.D.La.1986), *aff'd,* 834 F.2d 496 (5th Cir. 1987), the Court held that elections involving only Non–Black candidates are not probative because when left with a choice of only Non–Black candidates, it is "virtually

unavoidable that certain Non–Black candidates would be supported by a large percentage of ... Black voters." *Id.* at 502. Similarly, in *Campos v. Baytown,* 840 F.2d 1240 (5th Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989), the Fifth Circuit rejected the defendants' argument that the district court should have considered "all elections, including anglo-anglo races" and that "anytime a candidate gets a majority of the minority votes he is the 'chosen representative' of the minority group". *Id.* at 1245. The Court held that the trial court properly considered only elections with minority candidates. *Id.*

Although the Eleventh Circuit has been less adamant than the Fifth Circuit in rejecting the argument that elections without Black candidates are relevant in a § 2 claim, it has not, thus far, considered those elections in considering racial bloc voting. For example, in *Solomon v. Liberty County,* 865 F.2d 1566 (11th Cir.1989), *vacated,* 899 F.2d 1012 (11th Cir.1990) (*en banc*), Judge Kravitch's opinion alluded to the fact that the race of the candidate is an important consideration. Judge Kravitch noted that "on average, nearly 80% of Whites in Liberty County have voted as a bloc in elections involving Black candidates for County office ... Thus, Black voters have never had an opportunity to elect a Black representative despite their manifest preference for those Black candidates that have presented themselves". *Id.* at 1021. Moreover, the district court in *Bradford County NAACP v. City of Starke,* 712 F.Supp. 1523, 1540 n. 24 (M.D.Fla.1989), interpreted *Solomon's* focus on elections in which minorities participated as supporting the view that "White versus White" elections should be excluded from consideration.

Lastly, this Court finds that when elections do not include minority candidates, some Non–Black candidates will receive more of the Black vote than other candidates, but this does not automatically make that candidate the minority preferred candidate. As the district court in *Citizens for a Better Gretna v. City of Gretna,* 636 F.Supp. 1113, 1121 (E.D.La.1986) *aff'd,* 834

F.2d 496 (5th Cir.1987) noted, the argument that a district court should consider Non–Black elections recalls an anecdote once attributed to Henry Ford which illustrates the strained choice offered to the Black community in Non–Black elections. As the author noted:

At first it was possible to buy Model T touring cars that were painted red and Roadsters that were painted gray, but in mid–1909, under pressure to build as many cars as possible, the color for all Model Ts became dark green with Black trim and red striping. In 1912, with demand for the cars still rising and the urgent need for even greater standardization and simplification, Ford made his famous statement, 'any customer can have a car painted any color he wants so long as it is Black.' Thereafter, only Black cars poured out of the Highland Park factory."

*Id.* citing James P. Barry, Henry Ford and Mass Production 55 (1973). Therefore, this Court gives less weight to election races where only Non–Blacks are running in determining a Section 2 claim.

### (c) *Incumbency*

In analyzing data for a Section 2 claim, the Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), held that "the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as ... incumbency, ... may explain minority electoral success in a polarized contest." *Gingles,* 478 U.S. at 57, 106 S.Ct. at 2770. The Court noted that the list of special circumstances is illustrative, not exclusive. *Id.,* 478 U.S. at n. 26, 106 S.Ct. at n. 26.

Moreover, in *United States v. Marengo County Commission,* 731 F.2d 1546, 1572, the Eleventh Circuit observed that while appointment of a representative may have

"demonstrated an increased willingness of ... Whites to allow Black individuals to participate, [it] certainly does not demonstrate the ability of Black voters to elect officials [and n]either would [the appointee's] subsequent unopposed *re-election.* " (Emphasis in original.)

Defendants produced data demonstrating that in elections to the Dade County Commission involving Black candidates from 1968 to 1990, the Black candidate won seven of the thirteen elections.[35] Defendants argued that this success compels the conclusion that Black voters in Dade County have an equal opportunity to participate in politics and to elect candidates of their choice. A closer look at the circumstances in those races, however, demonstrates that incumbency resulting from appointment played a major part in the candidates' success. For example, of the four Black Commissioners who have been elected to the County Commission with a majority of the Black vote, three were first appointed, and then ran as incumbents. The only Black Commissioner who won with a majority of the Black vote and without the assistance of incumbency, was Earl Carroll, the first Black to serve on the County Commission.

In six of the most recent elections that the Black Plaintiffs analyzed, where a Black candidate received the majority of the Black vote, the Black candidate lost the election in every instance but one. In that one instance, the Black candidate was Barbara M. Carey, a two-term incumbent who had initially been appointed to office.

Accordingly, the Court concludes that Black candidates elected to office as incumbents after having first being appointed, is a special circumstance that explains the election of Blacks to the Dade County Commission.

### 3) Totality of the Circumstances

#### (a) *Racially–Polarized–Voting*

■ Although every *Zimmer* factor is important in a Section 2 claim, the Supreme

---

**35.** Defendants relied primarily on the testimony of Dr. Harold Stanley, an Associate Professor of Political Science at the University of Rochester in New York, and Dr. Charles David Moon, II, an Assistant Professor of Political Science at the University of Miami in Florida. Dr. Stanley was named an expert in voting behavior and political science, and Dr. Moon was rendered an expert in the area of elections and politics in Dade County. Since Dr. Moon heavily relied on the results of Dr. Stanley's analysis, the Court analyzed Dr. Stanley's conclusions.

Court in *Thornburg v. Gingles*, 478 U.S. 30, 51 n. 15, 106 S.Ct. 2752, 2765 n. 15, 92 L.Ed.2d 25 (1986), recognized that some *Zimmer* factors are more important in vote dilution claims than others. The Court stated that one of the most important factors in a vote dilution claim is the " 'extent to which voting in the elections of the state or political subdivision is racially-polarized.' " This Court adopts the *Gingles'* definition of racially-polarized-voting—"a consistent relationship between [the] rates of the voter and the way in which the voter votes," or, stated differently, where "Black voters and [Non–Black] voters vote differently." *Id.* at 54, 106 S.Ct. at 2768 n. 21.

Upon review of all the evidence, the Court concludes that legally significant racially-polarized-voting exists in Dade County. The Court credits the statistical evidence presented by Dr. Richard Engstrom which demonstrates that Dade County's Black voters generally and overwhelmingly support the Black candidates and that the Non–Black voters rarely give Black candidates a majority of their votes.

In determining whether Dade County's elections are racially-polarized, the Court analyzed seven elections over the period of the last three election years, which encompassed a four-year period, and concludes that racially-polarized-voting impairs Blacks in their ability to elect their preferred representatives in Dade County.

### (b) *Unusually Large Election Districts/Majority Vote Requirements*

Dade County has both an unusually large election district and a majority vote requirement. In order to win an election, a candidate must receive more than 50% of the vote. If no candidate receives more than 50% of the vote, then the two candidates with the most votes engage in a run-off election. The Court concludes that the majority vote requirements tends to dilute the political strength of minority groups. In addition, Dade County's unusually large geographic size makes it more difficult for Black candidates to campaign for office. Therefore, these two factors, when considered together, impair Blacks' ability to participate in the political process and elect their preferred candidates.

### (c) *Political Campaigns and Racial Appeals*

Testimony at trial revealed that there have been overt and subtle racial appeals in political campaigns in Dade County. The Court concludes that the racial appeals in Dade County persist to the present time and that the effect of such appeals is to dilute the opportunity of Black citizens to participate effectively in the political processes and to elect candidates of their choice.

### (d) *Black Preferred Representatives Elected*

After analyzing data produced by Dr. Engstrom on the seven most recent elections occurring over a period of three election years and encompassing a four-year period, the Court concludes that, because of racially-polarized-voting, Blacks have been unable to elect their preferred representatives.

Even if the Court chose to analyze election data from 1968, the Court still concludes that since three of the four Black Commissioners who have been elected with a majority of the Black vote ran as incumbents, Blacks have been impaired in their ability to elect their preferred representatives in the absence of special circumstances such as incumbency. *See Gingles*, 478 U.S. 30, 55, 106 S.Ct. 2752, 2769. The second Black Commissioner elected to the County Commission without the benefit of appointment and incumbency was Arthur Teele, who did not receive a majority of the Black vote and, therefore, is not the Blacks' preferred candidate.

Defendants also argued that Sherman Winn was the Blacks' preferred candidate in 1990 because he ran against other Black candidates and received 53% of the Black vote. Although Sherman Winn did, in fact, receive the majority of the Black votes cast for District 4 candidates, he ranked fourth among the candidates who received the majority of Black votes countywide. Since the Eleventh Circuit has not addressed this issue, this Court looks to the Fourth Circuit, which is the only court to address the is-

sue. In *Collins v. City of Norfolk, Va.,* 883 F.2d 1232 (4th Cir.1989), the district court found that since a White candidate had received the majority of the minority ballots, but less than Black candidates who had received more Black votes but who had lost, the White candidate was the minority community's preferred candidate and, therefore, Whites did not vote sufficiently as a bloc to usually defeat the minority-preferred candidate. On appeal, the Fourth Circuit in reversing the district court, held that the district court mischaracterized the successful White candidate as the minority community's preferred candidate and declared that "support for some successful candidates by a majority of minority voters in multimember district races does not prove that the successful candidates were the chosen representatives of the minority when a candidate who received much greater minority support was defeated." *Collins,* 883 F.2d at 1240. Similarly, in this case, where Sherman Winn ranked fourth among the candidates who received the majority of Black votes countywide, the Court concludes Sherman Winn, who is Non–Hispanic White, was not the Blacks' preferred candidate in 1990.

Lastly, even if this Court gave greater weight to all 13 elections in which Black candidates have participated since 1968, the fact that Black candidates have won 7 of the 13 elections is trivial because the data is based on the Black community's ability to elect a single Black member to the County Commission. Statistics do not demonstrate the fact that since 1968 the Black population has been unable to elect a second representative to the County Commission. Therefore, to attach greater weight

to the County's analysis of these statistics would ratify token representation.[36]

The data demonstrates that from 1968 until 1990 all of the Black preferred candidates for a second seat on the County Commission were defeated by candidates preferred by Non–Blacks. The Court, therefore, concludes that there is legally-significant Non–Black bloc voting. *See Collins v. City of Norfolk, Va.,* 883 F.2d 1232, 1241 (4th Cir.1989), citing *Gingles,* 478 U.S. at 55, 106 S.Ct. at 2769.

### (e) *Responsiveness*

The Eleventh Circuit in *United States v. Marengo County,* 731 F.2d 1546, 1573 (11th Cir.1984) recognized that the best evidence of lack of responsiveness is racially-polarized-voting. This Court has previously concluded that there is severe racially-polarized-voting in Dade County Commission elections.

### (f) *Tenuous Policy*

The Court concludes that the policy underlying the maintenance of the present at-large system in Dade County is not a significant factor to be considered in determining whether there exists a violation of Section 2 in light of the results test.

In conclusion, the Court holds that, based on the evidence at trial and the analysis under the totality of the circumstances, Black Plaintiffs have proven their Section 2 vote dilution claim.

### 4) Defendants' Affirmative Defense

■ Defendants argue that even if Black Plaintiffs prove vote dilution based on the totality of the circumstances, Defendants have proven a lack of racial bias on the part of the Dade County voters. The Court

---

**36.** Furthermore, the Eleventh Circuit in *Meek v. Metropolitan Dade County,* 908 F.2d 1540, 1548 (1990), has stated that Black candidates who have been elected to residence District 3 were not necessarily the preferred representatives of Blacks simply because they received the majority of the Black vote. The Court reasoned that a Black candidate elected to the County Commission was merely "a candidate who [was] perceived as viable *given* the at-large election scheme." *Id.* (emphasis in original). The Court continued that a preferred candidate is a candidate who can be "responsive to the particular needs of an insular community ... when evalu-

ated against a single-member district baseline." *Id.*

Based on the evidence at trial, this Court concludes that voters prefer a candidate who is more responsive to their particular needs. Thus, a single-member district plan is the appropriate standard against which to measure the preferred representative status of a Black candidate. In this case, where three of the four Black candidates who have received a majority of the Black votes ran as incumbents, the Court concludes that their election does not necessarily make them the Blacks' preferred candidates.

concludes that based on the evidence of racial voting patterns established at trial, Dade County is racially divided.

## VI. HISPANIC PLAINTIFFS

■ The Court has held that Hispanic Plaintiffs have proven that 1) Hispanics are sufficiently large and geographically compact to constitute a majority in a single-member district, and 2) Hispanics are politically cohesive. Therefore, prongs one and two of *Gingles* have been satisfied.[37]

### A. *Findings of Fact*

Before discussing the third prong in *Gingles* and the *Zimmer* factors, the Court first addresses whether Hispanics in Dade County are a minority of registered voters and its legal significance.

According to the 1990 census data, Hispanics in Dade County comprise a majority (50.5%) of the voting age population. The Court finds, however, that Hispanics are a minority of the registered voters in Dade County. The extant 50.5% Hispanic voting age population majority does not establish *per se* the absence of racial vote dilution. *See Monroe v. City of Woodville*, 881 F.2d 1327 (5th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990); *Kirksey v. Board of Supervisors of Hinds County, Mississippi*, 554 F.2d 139, 150 (5th Cir.), *cert. denied*, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). In *Monroe*, 881 F.2d at 1333, the Fifth Circuit rejected the argument that a Section 2 claim is precluded wherever the minority group constitutes a majority stating:

Unimpeachable authority from our circuit has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution. *Zimmer v. McKeithen*, 485 F.2d [1297] at 1303. *Zimmer* relied

upon the Supreme Court's decision in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), which affirmed a finding of racial vote dilution in Bexar County, Texas, even though Mexican–American plaintiffs constituted a numerical majority there. *See Graves v. Barnes*, 343 F.Supp. 704, 733 (W.D.Tex. 1972) (3–judge panel), *aff'd, sub nom. White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332 [37 L.Ed.2d 314] (1973).

Furthermore, the Fifth Circuit in *Salas v. Southwest Texas Junior College District*, 964 F.2d 1542, 1550 (5th Cir.1992) has held that "just as this Court has rejected a *per se* rule that population majority groups cannot experience vote dilution through use of an at-large system, we hold that a protected class, that is also a registered voter majority is not foreclosed, as a matter of law, from raising a vote dilution claim." In this case, although Hispanics are a majority of the voting age population, the Court finds that Hispanics are not a majority of the registered voters in Dade County.[38] The classification of Hispanics as an electoral minority was confirmed by Defendant David Leahy, Supervisor of Elections for Dade County. Mr. Leahy testified that on March 17, 1988, he prepared an affidavit which listed Hispanics, including Hispanics born in the United States, at approximately 32.96% of the registered voters in Dade County. The Eleventh Circuit, in its *Meek* opinion, relied on Mr. Leahy's affidavit in determining that Hispanics comprised a minority of the registered voters in Dade County. *Meek*, 908 F.2d at 1545–46.

Mr. Leahy also testified that adjustments were made to those figures to update the numbers as of June 2, 1992.[39] The June 2, 1992 report shows that approximately 50% of the registered voters in Dade County are Non–Hispanic White, 30% are Hispanic, and 20% are Black.[40]

---

**37.** *See* District Court Order dated May 26, 1992, granting Plaintiffs' Partial Summary Judgment.

**38.** As discussed *supra* at n. 10, this Court is guided by the Eleventh Circuit and Judge King's July 30, 1991 Order to consider evidence of registered voters and not of total population or voting age population in conducting a vote dilution analysis.

**39.** Leahy Transcript at 142–43; *See* Appendix A.

**40.** Below are the records of the Dade County Division of Elections of the November 6, 1990 election listing the following breakdown of reg-

Hence, the Court finds, as Mr. Leahy concluded, that Hispanics, including Hispanics born in the United States, do not constitute a majority of all registered voters in Dade County.[41]

### B. *The Three–Pronged Gingles Test*

#### 1) Settled factual and legal issues

The Court has held that Hispanic Plaintiffs have satisfied prongs one and two of *Gingles*.[42]

#### 2) Prong Three—Non–Hispanic Bloc Voting

The third prong in *Gingles* requires that Hispanic Plaintiffs must be able to demonstrate that the Non–Hispanic majority[43] votes sufficiently as a bloc to enable it, in the absence of special circumstances, such as the minority candidate running unopposed, usually to defeat the minority's preferred candidate. *Id.*, 478 U.S. at 51, 106 S.Ct. at 2766–67.

To prove the third *Gingles* prong, Hispanic Plaintiffs presented data by bivariate regression analysis conducted by Dr. Gordon Henderson. Dr. Henderson, who was qualified as an expert in the area of statistical analysis and political science, identified a total of 19 County Commission election races involving Hispanic candidates, and where 18 of the 19 Hispanic candidates preferred by the Hispanic community were defeated.[44] In addition to these, in all 19 races which involved a Hispanic candidate, there was racially-polarized-voting between Hispanics and Non–Hispanics.

A regression analysis of at-large elections involving Hispanic County Commission candidates produced the following estimates of voting behavior:

| YEAR | DISTRICT | CANDIDATE | CANDIDATE % OF TOTAL VOTE | % OF HISPANIC VOTERS FOR | % OF NONHISPANIC VOTERS |
|---|---|---|---|---|---|
| 1974 | Seat 8– Primary | Oesterle (led) Fernandez | 24.5 16.3 | 12.3 53.7 | 27.1 9.1 |
| 1974 | Seat 8– Runoff | Oesterle (won) Fernandez | 69.4 30.6(L) | 21.8 78.2 | 79.2 20.8 |
| 1976 | Seat 3– Primary | Adams (led) Cruz | 42.3 10.9 | 5.9 79.7 | 46.3 5.1 |
| 1978 | Seat 2– Primary | Oliver (won) Casas | 71.6 28.4(L) | 24.7 75.3 | 81.5 27.6 |
| 1980 | Seat 6– | Redford (won) | 68.1 | 17.3 | 91.2 |

istered voters by race and ethnicity before the adjustments performed by Mr. Leahy's staff:

| | | |
|---|---|---|
| Non Hispanic Whites | 342,853 | 50.88% |
| Non Hispanic Black | 130,519 | 19.37% |
| White Hispanic | 187,393 | 27.81% |
| Black Hispanic | 3,262 | 0.48% |
| Other | 9,811 | 1.46% |
| Total | 673,838 | 100.00% |

**41.** The County argues that Hispanic Plaintiffs stipulated that Hispanics comprised a majority of the registered voters in Dade County and, therefore, Hispanic Plaintiffs cannot prevail in this case. The stipulation referred to by the County is the Sheskin Survey conducted by Ira Sheskin of the University of Miami on behalf of Dade County. Although Hispanic Plaintiffs stipulated to the accuracy of the survey, they did not agree with the County that the Survey specifies that Hispanics are a majority of the registered voters in Dade County. Moreover, the Survey comprised of interviews of only 791 Hispanic adults. Therefore, based on the disagreements between the parties as to certain conclusions derived from the Survey, and the fact that there was testimony presented at trial which contradicted the County's position, the Court relies on the registered voter evidence provided by Mr. Leahy, the Supervisor of Elections for Dade County. *See Coastal State Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1369 (5th Cir.1983) ("the trial court has not only the right but the duty to relieve a party from a pretrial stipulation 'where necessary to avoid manifest injustice ...' or where there is substantial evidence contrary to the stipulation.")

**42.** *See* District Court Order dated May 26, 1992.

**43.** Non–Hispanics refer to Non–Hispanic Blacks and Non–Hispanic Whites.

**44.** Although Dr. Henderson identified a total of 63 races overall in which there was racially-polarized-voting between Hispanic and Non–Hispanic voters, the Court only considers the 19 election races for the County Commission that involved Hispanic candidates.

| YEAR | DISTRICT | CANDIDATE | CANDIDATE % OF TOTAL VOTE | % OF HISPANIC VOTERS FOR | % OF NONHISPANIC VOTERS |
|---|---|---|---|---|---|
| | Primary | Lopez–Borges | 31.9(L) | 82.7 | 8.8 |
| 1980 | Seat 7– | Phillips (led) | 40.7 | 4.2 | 55.5 |
| | Primary | Morse | 23.1 | 69.6 | 5.9 |
| 1980 | Seat 7– | Phillips (won) | 54.1 | 4.8 | 69.4 |
| | Runoff | Morse | 45.9(L) | 95.2 | 30.6 |
| 1982 | Seat 1– | Schreiber (won) | 65.6 | 32.0 | 70.5 |
| | Primary | Barrios | 18.7(L) | 84.1 | 4.6 |
| 1982 | Seat 2– | Mackenzie (led) | 46.1 | 23.3 | 52.0 |
| | Primary | Valdes | 39.2 | 57.6 | 34.9 |
| 1982 | Seat 3– | Carey (won) | 68.2 | 8.1 | 81.5 |
| | Primary | Diaz | 18.8(L) | 82.3 | 5.0 |
| 1982 | Seat 4– | Shack (won) | 74.9 | 17.1 | 88.8 |
| | Primary | Cruz–Rodriguez | 25.1(L) | 82.9 | 11.2 |
| 1984 | Seat 4– | Winn (won) | 53.2 | 9.6 | 70.3 |
| | Primary | Cruz–Rodriguez | 23.7(L) | 79.8 | 3.0 |
| 1984 | Seat 7– | Phillips (won) | 65.5 | 22.1 | 79.9 |
| | Primary | Endara | 18.0(L) | 66.2 | 2.5 |
| 1986 | Seat 1– | Ferguson (won) | 39.7 | 7.1 | 51.2 |
| | Primary | Barrios | 16.6(L) | 56.3 | 2.2 |
| 1986 | Seat 2– | Valdes (won) | 55.7(W) | 85.4 | 42.8 |
| | Runoff | Weaver | 44.3 | 14.6 | 57.2 |
| 1988 | Seat 5– | Ruvin (won) | 56.1 | 18.1 | 71.6 |
| | Primary | Levitan | 43.9(L) | 81.9 | 28.4 |
| 1988 | Seat 7– | Phillips (led) | 24.4 | 1.5 | 34.1 |
| | Primary | Alonso | 22.2 | 64.7 | 1.2 |
| 1990 | Seat 2– | Penelas (led) | 34.9 | 37.9 | 34.2 |
| | Primary | Valdes | 32.1 | 40.1 | 29.8 |
| 1990 | Seat 2– | Penelas (won) | 53.3 | 42.5 | 52.3 |
| | Runoff | Valdes | 46.7(L) | 57.5 | 47.7 |

The only candidate who received a majority of both Hispanic and Non–Hispanic votes in the above chart was candidate Valdes, who ran as an incumbent in his first election in 1982 after having been appointed to the Commission. The statistics show that the Hispanic candidates listed above who ran for County Commission seats obtained 30.8% of the overall votes, 73.6% of the Hispanic votes, and 18.4% of the Non–Hispanic votes. Based upon the evidence of racially-polarized-voting, the Court finds that the Non–Hispanic population votes as a bloc sufficiently to usually defeat the Hispanics' preferred candidate.

C. *Totality of the Circumstances*

1) History of Official Discrimination

The State of Florida had a malapportioned legislature until the late 1960s as both Houses of the Florida Legislature apportioned State House and Senate seats on the basis of County boundaries rather than population. In the late 1960's, Florida adopted a method of electing legislators and senators from multi-member districts. That system was in effect until 1982. Only one Hispanic congressman serves from Florida. No Hispanic state senator was elected until four years ago.[45] While the Court recognizes that discrimination has existed in the past, and still lingers in some areas today, the Court also finds that it does not significantly preclude Hispanics from participating in the electoral process. Therefore, in determining vote dilution, the Court gives less weight to this factor as compared to the remaining factors.

2) Racially–Polarized–Voting

As previously detailed in the discussion of the third prong in *Gingles*, Hispanic Plaintiffs have established that there is racially and ethnically-polarized-voting in

---

**45.** *See In Re Constitutionality of Senate Joint Resolution 2G, Apportionment Session,* 597

So.2d 276, 291 (Fla.1992) (Shaw, J. Dissenting).

Dade County and that the Non–Hispanic voting bloc usually defeats the preferred choice of the Hispanic communities.

### 3) Unusually Large Election Districts Majority Vote Requirement

Dade County's at-large system encompasses an unusually large area. In order to be elected to the County Commission, a candidate must receive a majority of votes cast.[46] If no candidate receives a majority of votes cast, the two candidates with the highest number of votes participate in a runoff election. The effect of this majority vote requirement is to reduce the opportunity for Hispanic candidates to win elections, if not in a first election, then in a run-off election. This adverse effect is magnified as to Hispanic Plaintiffs, where as this Court has found, there also exists racially-polarized-voting. While the Court recognizes that the majority vote requirement is not the sole factor in the inability of Hispanic candidates being elected, the Court finds that it is a continuing obstacle to the opportunity of Hispanic voters to elect their preferred representatives.

### 4) Discrimination in Education and Employment

Economic information for Dade County broken down by race and ethnicity from the 1990 census was not available at the time of trial in this matter. The 1980 census information, however, shows significant economic and educational disparities between Hispanic and Non–Hispanic White residents. Hispanics in poverty in 1980 were 40.4% of all persons in poverty. Hispanic families were twice as likely as Non–Hispanic White families to be in poverty. In 1979, 14.5% of Hispanic families were officially poor, and it is expected that the 1990 census will show that these propor-

tions have increased in the last decade in South Florida.[47]

Hispanics also have a higher unemployment rate than Non–Hispanics. For example, the Hispanic unemployment rate was 50% above the rate for Non–Hispanics and 60% above the rate for Non–Hispanic Whites. In March 1989, the Hispanic unemployment rate was 7.8%, compared to 5.2% for Non–Hispanics.[48] Although Hispanics have a higher unemployment rate than Non–Hispanic Whites, Hispanics have a much lower unemployment rate than Non–Hispanic Blacks.[49]

Moreover, although the Court finds that Dade County has not been totally unresponsive toward Hispanics, one area in which there is evidence of unresponsiveness is in the governmental work force. Metropolitan Dade County has a total work force of 21,992 as of September 30, 1991. In the work force, there were 7,449 Non–Hispanic Whites (33.90%), 7,458 Non–Hispanic Blacks (34.50%), and 6,622 Hispanics (30.10%). Job classification, in the work force, however, does not mirror the overall racial and ethnic distribution of employees. For example, Non–Hispanic Whites hold a majority, 57.4%, of all administrative jobs and 49% of all protective service jobs.[50] While Non–Hispanic Whites comprise a third of all County jobs, they hold two-thirds of all jobs with annual salaries over $43,000, sixty-five percent of jobs paying between $43,000 and $60,000, and over seventy-five percent of jobs paying over $60,-000 annually.

Concerning whether Hispanics bear the effects of discrimination in education, the Court recognizes that only 16.3% of Dade County high schools were integrated in 1987.[51] Hispanic students have a higher drop-out rate than Non–Hispanic White students, but less than Black students.[52]

---

**46.** There is no indication that when originally enacted, the purpose of the majority vote requirement was racial discrimination. This inquiry is irrelevant, however, in assessing its present effect on Hispanic Plaintiffs' Section 2 claim under the totality of the circumstances.

**47.** *See Indicators of Social and Economic Disparities in South Florida* at 25.

**48.** *Id.* at 53.

**49.** *Id.* at 58.

**50.** *Metropolitan Dade County, Florida, Affirmative Action Annual Report, October 1989—September 1990* at 19, 35, and 39.

**51.** *Id.* at 68.

**52.** *Id.* at 69.

Rates of Hispanic students not being promoted from one grade to the next parallel the drop-out rates.

While the Court recognizes that Hispanics bear the effects of discrimination in education and employment, the Court also finds that this discrimination does not significantly preclude Hispanics from participating in the political process. Therefore, the Court gives less weight to this factor as compared to the remaining factors.

### 5) Political Campaign/Racial Appeals

Political campaigns in Dade County have been characterized by overt and subtle appeals to racial prejudice.[53] Andrew Rosenblatt, Executive Director of Dade County's Fair Campaign Practices Committee, testified via deposition that "it was fair to characterize some campaigns," as appealing to racial or ethnic appeals.[54] Several political campaigns which exhibited ethnic appeals include the 1982 County Commission race between Beverly Philips and Lewis Morse,[55] the 1986 County Commission race between Jack Weaver and Jorge Valdes,[56] and the 1986 Charles Dusseau–Mirian Alonso County Commission race.[57] Rosenblatt testified at his deposition that the bigoted appeals in the campaigns traumatized the community:

> [I]n Dade County, when appeals are being made in the context of a political campaign to racial, ethnic or religious considerations it can often times tend to divide the community. Those divisions are often—and animosities that are generated in the context of a polarizing political campaign are often times not easily forgotten. The appeals themselves may cease on election day, but the bad feelings and divisiveness that has been generated as a result of the campaign linger.

*Id.* at 76–77.

The effect of ethnic appeals is to exploit prejudices on the part of the Non–Hispanic population concerning Hispanics and their participation in Dade County's political process. Therefore, the Court finds that the effect of racial appeals in Dade County's political campaigns is to reduce the opportunity of Hispanics to participate effectively in the political process.

### 6) Hispanic Candidates Elected to the County Commission

Unchallenged and uncontradicted evidence shows that only two Hispanics, Valdes and Penelas, have served on the County Commission. Since 1968, there were no Hispanic representatives on the County Commission until 1981. In 1981, the Board of County Commissioners appointed Jorge Valdes to the County Commission. Subsequently, Valdes, running as an incumbent, won election to the County Commission both in 1982 and 1986. In 1990, however, Alex Penelas defeated Jorge Valdes despite the fact that Valdes was the preferred candidate of Hispanic voters. Below is a list of Hispanic candidates who have run for the County Commission:

### Hispanic Candidates in Elections For County Commission

| YEAR | CANDIDATE | OFFICE | RESULT |
| --- | --- | --- | --- |
| 1968 | DeTorres | # 6 Primary | Lost |
| 1972 | Cruz | # 3 Primary | Lost |
| 1974 | Fernandez | Major Primary | Lost |
| 1974 | Fernandez | # 8 Primary | Lost |
| 1976 | Cruz | # 3 Primary | Lost |
| 1978 | Casas | # 2 Primary | Lost |
| 1980 | Lopez–Borges | # 6 Primary | Lost |
| 1980 | Morse | # 7 Primary | Lost |

53. Bush Testimony, Vol. 4 at 52; Ferre Testimony, Vol. 5 at 40; Deposition of Rosenblatt, at 42.

54. Deposition of Rosenblatt, at 12.

55. *Id.* at 7–8.

56. *Id.* at 10.

57. *Id.* at 11.

| YEAR | CANDIDATE | OFFICE | RESULT |
|------|-----------|--------|--------|
| 1980 | Morse | # 7 Runoff | Lost |
| 1982 | Barrios | # 1 Primary | Lost |
| 1982 | Ruiz | # 2 Primary | Lost |
| 1982 | Valdes | # 2 Primary | Won |
| 1982 | Valdes | # 2 Runoff | Won |
| 1982 | Diaz | # 3 Primary | Lost |
| 1982 | Cruz–Rodriguez | # 4 Primary | Lost |
| 1984 | Cruz–Rodriguez | # 4 Primary | Lost |
| 1984 | Haber | # 6 Primary | Lost |
| 1984 | Endara | # 7 Primary | Lost |
| 1986 | Barrios | # 1 Primary | Lost |
| 1986 | Gonzalez | # 2 Primary | Lost |
| 1986 | Valdes | # 2 Primary | Won |
| 1986 | Valdes | # 2 Runoff | Won |
| 1988 | Samitier | County Mayor | Lost |
| 1988 | Levitan | # 5 Primary | Lost |
| 1988 | Haber | # 6 Primary | Lost |
| 1988 | Pino | # 6 Primary | Lost |
| 1988 | Alonso | # 7 Primary | Removed |
| 1988 | Bucelo | # 7 Primary | Lost |
| 1988 | Koch | # 7 Primary | Lost |
| 1990 | Barrios | # 2 Primary | Lost |
| 1990 | Kennedy | # 2 Primary | Lost |
| 1990 | Penelas | # 2 Primary | Won |
| 1990 | Pulles | # 2 Primary | Lost |
| 1990 | Valdes | # 2 Primary | Won |
| 1990 | Penelas | # 2 Runoff | Won |
| 1990 | Valdes | # 2 Primary | Lost |

Based on the above data, the Court recognizes that Hispanic candidates have had little success in being elected to the Dade County Commission. Therefore, the Court finds that the Hispanic community is precluded from electing their preferred representatives.

### 7) Responsiveness

The Eleventh Circuit in *United States v. Marengo County,* 731 F.2d 1546, 1573 (11th Cir.1984) recognized that the best evidence of lack of responsiveness is racially-polarized-voting. The Court has previously concluded that Dade County experiences racially-polarized-voting between Hispanics and Non–Hispanics.

### 8) Tenuous Policy

The Court concludes that the policy underlying the maintenance of the present at-large system in Dade County is not a significant factor to be considered in determining whether there exists a violation of Section 2 in light of the results test.

In conclusion, the Court holds that, based on the evidence at trial and the analysis under the totality of the circumstances, Hispanic Plaintiffs have proven their Section 2 vote dilution claim.

### *Summary of Findings of Fact*

The Court finds that under the totality of circumstances the present at-large election system deprives Hispanics in Dade County of the opportunity to participate effectively in the political process and elect their preferred representatives.

### D. *Hispanic Plaintiffs' Conclusions of Law*

### 1) Three Gingles Prongs

As stated earlier, this Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 & 1343, and 42 U.S.C. § 1973j(f).

**58.** Candidate Alonso was removed from the runoff ballot after it was discovered that she did not meet the district residency requirement.

**994**

Also addressed previously, the Eleventh Circuit has affirmed the conclusion of a prior district court that Hispanic Plaintiffs have satisfied their burden as to the first and second prongs of the *Gingles* test. *Meek*, 908 F.2d at 1549. Moreover, this Court has entered a partial summary judgment on these issues as well.

Hispanic Plaintiffs have also met their burden in proving that Non–Hispanic voters vote sufficiently as a bloc to usually defeat the Hispanic voters' preferred candidate.

### 2) Totality of the Circumstances

■ Hispanic Plaintiffs are not required to prove any particular number of factors or that a majority of them point one way or the other. *Gingles*, 478 U.S. 30, 45, 106 S.Ct. 2752, 2763, 92 L.Ed.2d 25 (1986). Although no factor is indispensable, a showing of racially-polarized-voting will ordinarily be the keystone of a dilution case. *United States v. Marengo County Commission*, 731 F.2d at 1566. In this case, the statistical evidence clearly shows that where Hispanic candidates ran for the County Commission, there was racially-polarized-voting between Hispanic voters and Non–Hispanic voters. Moreover, Hispanic candidates who received a majority of Hispanic votes, lost eighteen out of nineteen contests, including primaries. Furthermore, the Court concludes, that in conjunction with the totality of relevant circumstances, Hispanics are deprived of the opportunity to fully participate in the electoral process and to elect representatives of their choice to the Dade County Commission.

### 3) Defendants' Affirmative Defense

■ Defendants contend that, even if Hispanic Plaintiffs have shown vote dilution based on the totality of circumstances, Defendants have proven a lack of racial bias on the part of Dade County voters. The Court concludes that based on the evidence of racial voting patterns adduced at trial, Dade County is racially divided.

## VII. CONCLUSION

Based upon the foregoing discussion, it is ORDERED AND ADJUDGED that the present at-large system in Dade County does not comply with the mandate of Section 2 of the Voting Rights Act, as amended in 1982. It is further ORDERED AND ADJUDGED that the County is enjoined from conducting elections pursuant to the present system.

Defendants shall submit to the Court a proposed new plan for electing persons to the County Commission within twenty days from the date of this Order.

DONE AND ORDERED.